

# Child Pornographer Offenders Do Not Have Florid Offense Histories and Are Unlikely to Recidivate

Richard Wollert, Ph.D.
Independent Practice
1220 S. W. Morrison
St., St. 930
Portland, OR 97205
360.737.7712
rwwollert@aol.com

Jacqueline Waggoner, Ed.D.
University of Portland
5000 N. Willamette Blvd.
Portland, OR 97203
503.943.8012
waggoner@up.edu

Jason Smith, Psy.D.
Iowa Dept. of Human Services
1251 Cedar Loop
Cherokee, Iowa 51012
712.225.6948
jsmith4@dhs.state.ia.us

Poster presented at the Annual Conference of the

Association for the Treatment of Sexual Abusers

October 2, 2009, Dallas, Texas

Citation per the format of the American Psychological Association Publication Manual:

Wollert, R. W., Waggoner, J., & Smith, J. (2009, October). *Child porngraphy offenders do not have florid offense histories and are unlikely to recidivate.* Poster session presented at the annual meeting of the Association for the Treatment of Sexual Abusers, Dallas, TX.

Child Pornography Offenders Do Not Have Florid

Offense Histories and Are Unlikely to Recidivate

Hernandez presented a paper in 2000 at the Annual Convention of the *Association for the Treatment of Sexual Abusers* in which he compared the values of two dependent variables (DVs) he compiled from a review of the records of 54 child pornography offenders (CPOs) who participated in the sex offender treatment program (SOTP) he directed at the Federal Correctional Institution in Butner, North Carolina. The first DV reflected the number of adjudicated and nonadjudicated child molestations – operationalized as disclosures detailed in presentence investigations (PSIs) – that each "subject was known to have committed prior to treatment" (p. 2). The second reflected the number of adjudicated and nonadjudicated child molestations that each offender who was in treatment for six months disclosed to SOTP staff members.

Hernandez found that CPOs disclosed many more child molestations to SOTP staff than presentence investigators. This, in turn, led him to conclude that CPOs "can be equally predatory and dangerous as extrafamilial offenders" (p. 6).

Bourke and Hernandez (2009) recently elaborated this position in a paper that they published in *The Journal of Family Violence*. In particular, they argued that CPOs harbor "pervasive and enduring" (p. 191) pedophilic interests that cause them to access child pornography on the Internet. This access reinforces their "paraphilic lifestyle" and results in "behavioral disinhibition" that makes them likely to commit more child molestations.

To test this theory, Bourke and Hernandez collected sexual history data on 155 more CPOs who volunteered for treatment at Butner. They found that a total of 75 incidents of child molestation were reported in the PSIs for 26% of the offenders in this

cohort. During treatment, however, a total of 1,777 molestations were reported by 85% of the Butner patients and "67% of the admitted hands-on offenders (n=131) acknowledged abusing both pre-pubescent and post-pubescent children" (p. 187).

Assuming that disclosures made in treatment reflected the "true extent" (p. 191) of the sex offense histories of CPOs, Bourke and Hernandez suggested that the results validated their CPO theory and underscored "the importance of prison-based sex offender treatment by enhancing the accuracy of risk appraisals" (p. 191).

Although the format of Bourke and Hernandez' article may convey the aura of science, their results are misleading for a number of reasons. First, clients in our outpatient programs who also participated in the Butner program have told us that they found the Butner definition of a sex offense to be more inclusive than more typical definitions that are encountered in everyday settings. Second, the same clients have also told us that the policies of the Butner program led them to believe that they were expected to amend their offense disclosures on a regular basis and that they did their best to appear responsive to this demand because they did not want to be seen in a negative light. Third, the primary content of the DV adopted by Bourke and Hernandez – self-disclosed incidents of nonadjudicated crimes – is <u>not</u> the consensually accepted standard for assessing the risk of child molestation. That status is reserved for post-apprehension recidivism in the form of new arrests or convictions. In light of the importance of this measure, Bourke and Hernandez did not adequately address the issue of dangerousness because they did not collect recidivism data.

The foregoing limitations suggest that Bourke and Hernandez may have exaggerated the dangerousness of CPOs and that data need to be collected on the post-apprehension recidivism rates of CPOs to adequately appraise this issue.

The following results were obtained from the treatment and offense histories of a cohort of 72 individuals who participated in our federally-funded outpatient treatment programs after they were charged with or convicted of Possession, Distribution, or Production of Child Pornography (PCP). Contrary to Bourke and Hernandez' results, which are probably attributable to poor research methodology, they suggest that CPOs do not have violent histories and are less likely to recidivate than other types of sex offenders.

### Description of Supervision Violation (SV) and Recidivism Data

The number of months that each federal supervisee had "survived" in the community on the closing date for this report (September 1, 2009) was determined. This period ended whenever a supervisee absconded, died, was taken into custody for a supervision violation, was sentenced to prison, or was charged with a new sex offense. Otherwise, it ended on the closing date. Table 1 breaks down the months that each supervisee was at risk by the supervision performance and recidivism status. Over an average span of 4.0 years it was found that one out of 72 CPOs was taken into custody for possessing child pornography. Another CPO who was on active supervision was also apprehended for the commission of a non-contact sex offense. None of the CPOs were arrested on charges of child molestation, however, and no one who had successfully completed supervision was charged with either a contact or non-contact sex offense.

Table 1. A summary of the recidivism status and supervision performance of 72 child pornography offenders referred to federally-funded outpatient treatment programs.

| Months at risk | | Abbreviations |
|---|---|---|
| 0 – 12    | x x x X x x x x x                     | x = no new contact or non-contact sex crimes |
| 13 – 24   | x x x A x x x C x B S x x             | |
| 25 – 36   | x x x X x x x x x                     | S = taken into custody for personal safety (SV*) |
| 37 – 48   | x x x X x x x x x x x x x x x x x     | |
| 49 – 60   | x x x X x                             | A = had adult pornography (SV) |
| 61 – 72   | x x x X x x                           | |
| 73 – 84   | x x x                                 | B = had stories about sex with children (SV) |
| 85 – 96   | x x x N                               | |
| 97 – 108  | x x                                   | C = had child pornography |
| 109-120   | x                                     | |
| 121-132   | x                                     | N = committed a noncontact sex offense |
| 133-144   | x                                     | |
| Over 144  | x                                     | |

## Sexual Misconduct Other Than Possession of Child Pornography

Possession of Child Pornography (PCP) was the index crime for all offenders in this study. Information about seven additional patterns of sexual offending, presented in Table 2, was compiled on each offender from the records in his file. Ten subjects had prior convictions for contact sex offenses. Two had a prior conviction for PCP. Three had previously been convicted of either public indecency, peeping, or both. Six were convicted of a contact sex offense when they were convicted of the index PCP offense. Only one, however, used the Internet to arrange a meeting with a minor female.

Seventy-two percent (52 offenders) of all supervisees were negative for patterns of sexual conduct problems beyond PCP. Furthermore, the patterns in Table 2 suggest that the 28% of supervisees in this study who were positive for additional sexual conduct problems did not commit a broad range of sex offenses.

Table 2. Sex offenses that child pornography offenders committed in addition to possessing child pornography

| ID# | 1. Prior sex contact crimes(#) | 2. Prior PCP crimes(#) | 3. Prior exposure crimes(#) | 4. Prior peeping crimes(#) | 5. The index crime was for a contact sex crime & PCP. | 6. An attempt was made to meet with a minor. | 7. The victim was a family member. |
|---|---|---|---|---|---|---|---|
| 6 |  |  |  | 1 |  |  |  |
| 7 | 1 |  |  |  |  |  | No |
| 8 | 1 |  |  |  |  |  | No |
| 14 |  |  |  |  | Yes |  | Yes |
| 22 | 1 |  |  |  |  |  | Yes |
| 23 | 2 |  |  |  |  |  | Yes |
| 31 |  |  |  |  | Yes | Yes | No |
| 32 | 1 |  |  |  |  |  | Yes |
| 35 | 1 |  |  |  |  |  | Yes |
| 37 | 1 |  |  |  |  |  | No |
| 41 |  |  |  |  | Yes |  | No |
| 45 |  | 1 | 1 |  |  |  | No |
| 48 |  |  | 1 | 1 |  |  | No |
| 54 |  | 1 |  |  |  |  | No |
| 57 | 1 |  |  |  | Yes |  | No |
| 62 | 1 |  |  |  |  |  | Yes |
| 65 |  |  |  |  | Yes |  | Yes |
| 66 |  |  |  |  | Yes |  | No |
| 70 |  |  |  |  |  | Yes |  |
| 73 | 1 |  |  |  |  |  | No |

**Other Relevant Information For Assessing**

**The Risk Of Violent Or Sexual Recidivism**

Average current age: 48

    Significance: The risk of recidivism decreases with age.

Number of violent crimes committed at the same time as PCP: 0

    Significance: This suggests a reduced risk of recidivism.

Number of violent crimes committed prior to committing PCP: 1

    Significance: This suggests a reduced risk of recidivism.

Number of offenders having four or more sentencing dates prior to PCP conviction: 2

Significance: This suggests a reduced risk of recidivism.

Number of offenders convicted of PCP never in a long-term committed relationship: 25.

Significance: The impact this factor has on this group remains to be determined.

## Conclusions

This is the first report that, to our knowledge, has been compiled on the treatment performance and offense patterns of individuals referred to federally-funded outpatient treatment programs after being charged with or convicted of possessing child pornography. Whereas research by the U.S. Department of Justice (Langan, Schmitt, & Durose, 2003) indicates that over 3% of child molesters released to the community are rearrested for another contact sex crime against a child during a 3-year risk period, none of the CPOs in the present study were rearrested for this type of crime during a 4.0 year survival period that censored the data of offenders who died or were taken into custody for other offenses. Since survival analysis generates larger recidivism estimates than risk period analysis (Prentky, Lee, Knight, & Cerce, 1997), this finding indicates that CPOs differ from child molesters.

The results of this study are also consistent with the results of the very small number of other follow-up studies that show that CPOs do not represent a high risk of recidivism and do not have florid or violent criminal histories (Endrass, Urbaniok, Hammermeister, Benz, Elbert, Laubacher, & Rossegger, 2009; Seto & Eke, 2005). Furthermore, it has been our experience that the great majority of offenders in this group generally do quite well in treatment, supervision, and post-supervision, and are able to conform their behavior to society's expectations. Finally, very few CPOs meet the

criteria for being diagnosed as suffering from Pedophilia (American Psychiatric Association, 2000).

The present results do indicate, however, that a relatively large proportion of CPOs have never been involved in a committed relationship. This, in turn, suggests that withdrawal, social isolation, or disrupted social relationships may be significantly related to the commission of child pornography for many CPOs. Treatment of those supervisees who fall in this category might therefore place additional emphasis on the development of their social skills and on the implementation of plans for helping them effect an integration with the larger community that is responsible, meaningful, and stable.

## References

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders* (4th ed. -TR). Washington, D.C.: Author.

Bourke, M. L. & Hernandez, A. (2009). The "Butner Study" Redux: A report of the incidence of hands-on victimization by child pornography offenders. *Journal of Family Violence, 24,* 183-191.

Endrass, J., Urbaniok, F., Hammermeister, L., Benz, C., Elbert, T., Laubacher, A., & Rossegger, A. (2009). The consumption of Internet child pornography and violent and sex offending. *BMC Psychiatry, 9:43,* doi: 10.1186/1471-244X-9-43.

Hernandez, A. (2000, November). *Self-reported contact sexual offenses by participants in the Federal Bureau of Prisons' Sex Offender Treatment Program: Implications for Internet sex offenders.* Paper presented at the Annual Conference of the Association for the Treatment of Sexual Abusers, San Diego, CA.

Langan, P. A., Schmitt, E., & Durose, M. (2003). Recidivism of sex offenders released from prison in 1994. Washington, DC: U.S. Department of Justice (http://www.ojp.usdoj.gov/bjs/).

Prentky, R. A., Lee, A., Knight, R., & Cerce, D. (1997). Recidivism rates among child molesters and rapists. *Law and Human Behavior, 21,* 635-659.

Seto, M. C. & Eke, A. (2005). The criminal histories and later offending of child pornography offenders. *Sexual Abuse, 17,* 201-210.

Raleigh News + Observer
7/19/07

# Child molesting linked to porn

## Study at Butner elicits controversy

**BY JULIAN SHER AND BENEDICT CAREY**
**THE NEW YORK TIMES**

Experts often have wondered what proportion of men who download explicit sexual images of children also molest them. A new government study of convicted Internet offenders suggests that the number may be startlingly high: 85 percent of the offenders said they had committed acts of sexual abuse against minors.

The study, which has not yet been published, is stirring debate among psychologists, law enforcement officers and prison officials, who cannot agree on how the findings should be presented or interpreted.

The research, carried out by psychologists at the Federal Bureau of Prisons, including the federal correctional institute in Butner, N.C., is the first in-depth survey of such online offenders' sexual behavior done by prison therapists who were actively performing treatment. Its findings have circulated privately among experts, who say the findings could have enormous implications for public safety and law enforcement.

Traffic in online child pornography has exploded in recent years, and researchers have not known what proportion of men who downloaded images of children were also molesters; the new study, some experts say, should be made public as soon as possible, to identify men who claim to be "just looking at pictures" but are in fact going beyond voyeurism.

Yet others say that the results, while significant, risk tarring some men unfairly as predators. The findings, based on offenders serving

SEE OFFENDERS, PAGE 10A

# OFFENDERS

CONTINUED FROM PAGE 1A

prison time who volunteered for the study, do not necessarily apply to the large and diverse group of adults who have at some point downloaded child pornography.

Adding to the controversy, the prison bureau in April ordered the paper withdrawn from The Journal of Family Violence, a peer-reviewed academic journal where it had been accepted for publication. The bureau apparently was concerned that the results might be misinterpreted. A spokeswoman for the bureau said the agency was reviewing a study of child pornography offenders but declined to comment further.

Ernie Allen, who leads the National Center for Missing and Exploited Children, which is mandated and largely financed by Congress to coordinate the nation's efforts to combat child pornography, said he was surprised that the full study had not been released. "This is the kind of research the public needs to know about," Allen said.

Understanding the relationship between looking at child porn and sexually assaulting children is central to developing effective treatment, psychologists say.

Everyone asked agrees that researchers need to learn more about online consumers of illegal child images. The volume of material seized from computers appears to be doubling each year — the national center collected more than 8 million images of explicit child pornography in the past five years — and Attorney General Alberto R. Gonzales, backed by the White House, made child protection a national priority by pushing through the Project Safe Childhood initiative in 2006.

Those who are arrested on charges of possession or distribution of child pornography generally receive lighter sentences than sexual abusers, and shorter parole periods. They do not fit any criminal stereotype; recent arrests have included politicians, police officers, teachers and businessmen.

"It's crucial to understand the sexual history of all these offenders, because sometimes the crime they were arrested for is the tip of the iceberg, and does not reflect their real patterns and interests," said Jill S. Levenson, an assistant professor of human services at Lynn University in Boca Raton, Fla., and head of the ethics division of the Association for the Treatment of Sexual Abusers.

## Butner clinic studied

The psychologists who conducted the new study, Andres E. Hernandez and Michael L. Bourke, focused on 155 male inmates who had volunteered to be treated at the federal correctional institute in Butner, N.C., according to a draft of the paper obtained by The New York Times from outside experts who want the study published.

The Butner clinic is the only residential program devoted to the treatment of sexual offenders in the federal prison system. The inmates in the study were all serving sentences for simple possession or distribution of child pornography — not for any touching or molesting of children.

Every six months during an 18-month treatment program, they filled out a record of their sexual history, including a "victims list," identifying their previously undisclosed targets of abuse. Therapists encouraged the men to be honest as part of their treatment, and the sexual histories were anonymous, according to the paper.

The psychologists compared these confessions to the men's criminal sexual histories at the time of sentencing. More than 85 percent admitted to abusing at least one child, they found, compared with 26 percent who were known to have committed any "hands on" offenses at sentencing. The researchers also tallied many more total victims: 1,777, an almost 20-fold increase from the 75 identified when the men were sentenced.

Hernandez and Bourke concluded that "many Internet child pornography offenders may be undetected child molesters." But they also cautioned that offenders who volunteer for treatment may differ in their behavior from those who do not seek treatment.

## Paper controversy

They submitted the paper to The Journal of Family Violence, one of the top publications in the field, and by March it was accepted.

But in a letter obtained by The Times, dated April 3, Judi Garrett, an official of the Bureau of Prisons, requested that the editors of the journal withdraw the study, because "Mr. Hernandez failed to submit for agency review the version of the paper that he provided to you for publication."

The Journal of Family Violence did not respond to messages asking about the withdrawal. Hernandez mentioned the research briefly during testimony before a Senate committee last year.

Some outside researchers agreed that the risk of over-generalizing the study's results was real, and they added that some prosecutors might try to use it to persuade courts to impose stiffer penalties. But almost all the experts interviewed also agreed that the study should still be made public.

August, 2010

**The Herald-Sun**
Durham, North Carolina
Richard A. Bean | Publisher
Robert Ashley | Editor
Elizabeth O'Donovan | Editorial page editor
Nancy Wykle | Managing editor

## EDITORIALS

#3

# Facts and myths at SBI crime lab

The State Bureau of Investigation's crime lab has become a cautionary tale of what happens when evidence is corrupted to match a hypothesis.

Far from fact, the lab's findings have been altered, edited and obscured so that the results that were presented to defense attorneys and juries veer from the realm of science into something closer to myth. When they were unable to repeat experiments that demonstrated a desired conclusion, FBI investigators say, at least eight lab technicians suppressed their outcomes.

But experiments must be duplicable in order to be credible. Data must be faithfully reported before we can ponder its implications.

These are not new concepts — in fact, we turn to dead languages to describe them.

Those who were awake in math class know Q.E.D., shorthand for "quod erat demonstrandum" or "that which was to be proved." It's the declaration that wraps up a proof, declaring the case closed, the job done, the answer reached through clear, logical steps that are open to examination. Archimedes used to throw that gauntlet: Check my work, it says.

The modern scientific method may not have arrived in the western world until the 17th Century, but empiricism — the idea that knowledge is derived from observation and proved by evidence, not eloquence — dates back to Aristotle.

So here is the problem: North Carolina's criminal forensics lab is compromised.

Here is the proof: Independent investigators from the FBI have examined the lab's work on blood evidence from 1987 to 2003. They found 190 criminal cases in which "information that may have been material and even favorable to the defense of an accused defendant was withheld or misrepresented" by a lab that is tied too closely to law enforcement. This could cost the state millions in lawsuits, and it shatters public confidence in our justice system.

Here is the solution: Sever the special relationship between the crime lab and the SBI, establish independent funding for facilities and staff, bring the lab policies in line with federal forensic guidelines, and put a scientist, not a politician, at the helm with the clear message that the lab's role is to find facts, not guilt.

Q.E.D.



#4

| Name | Reg. No. | Personal/Legal | Signature |
|---|---|---|---|
| NEUHAUSER | 43446-083 | PERS. | J. Neuhauser |
| D. King | 02899-000 | Legal | Daniel King |
| HORN | 09183-045 | LEGAL | J. Horn |
| Aldrich | 13800-052 | Legal | H. ar. |
| HALL | 09667-052 | LEGAL | |
| Hicks | 07421-003 | Personal | Hicks |
| | | | |
| | | | |
| | | | |
| | | | |

Friday, August 13, 2010

BP-S567.051   **IAD/STATE WRIT - ACKNOWLEDGMENT** CDFRM
AUG 02
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

---

This form is to be used whenever an inmate is released to state custody via IAD or State Writ.

**#5**             **ACKNOWLEDGMENT**

I acknowledge that I am temporarily being transferred from federal to state custody for purposes of trial on state charges. I am aware that State officials are to return me to federal custody at the conclusion of my state trial.

I am also aware that State officials should not release me into the community. If I am released by State authorities into the community, I am aware that my federal sentence will not run, and that I will not receive credit for my federal sentence for any period of time I am in the community following release by the State officials.

If State officials release me or transfer me to any facility, agency, or person other than Federal, I agree to immediately call the following Bureau of Prisons Official (collect, person-to-person) at the designated federal institution in which I am presently incarcerated as indicated below.

In the event this official cannot be reached, I agree to contact another staff member (collect, person-to-person) in the Inmate Systems Management Department of this institution.

| Inmate Printed Name and Signature | Register No. | Date |
|---|---|---|
| NEUHAUSER, Jeffrey / *Jeffrey Neuhauser* | 43446-083 | 8/30/10 |
| Staff Witness (Printed Name and Signature) | Institution | |
| A. Champin / *AC* | FCI 1 | |
| Name of Staff to Contact | | |
| **CANDACE GREGORY, ISM** | | |

| Title | Phone Number |
|---|---|
| **ISM** | **919-575-4541** |

**Note:** By signing, staff certify that the inmate has been provided with a copy of the completed form. If the above staff member is unavailable, another Inmate Systems staff member is to be contacted.

---

Original - J&C File; Copy - Control Center; Copy - Operations Lieutenant; Copy - Central File; Copy - Inmate

(This form may be replicated via WP)                    Replaces BP-S567 of FEB 94